UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Timmy Webber

    Plaintiff(s),

v.

Metropolitan Council, a public corporation
And political subdivision,

    Defendants.

CASE NO. _____

***VERIFIED COMPLAINT***

COMES NOW the above the named plaintiff, Timmy Webber, who states as and for his Complaint as follows:

## PRELIMINARY STATEMENT

1. This is an employment case based upon unlawful discrimination of long-time employee, Timmy Webber ("Webber"), in both promotion and benefits, arising out of his employment with Metro Transit owned and operated by Defendant Metropolitan Counsel in Minnesota. Webber is a Metro Transit bus operator who brings this lawsuit after participating in an U.S. Equal Employment Opportunity Commission ("EEOC") discrimination charge. Webber has now been issued a Notice to Right to Sue letter which authorizes him to pursue his discrimination claims in court. Now, Webber seeks damages and injunctive relief as allowable under the American with Disabilities Act of 1990, the Rehabilitation Act of 1973, and the Minnesota Human Rights Act.

## PARTIES

2. Plaintiff Webber is an individual who resides in the city of Waverly, State of Minnesota, County of Wright and who is a disabled person.

3. Defendant Metropolitan Council (Met Council) is a public corporation and political subdivision of the state of Minnesota as set forth in Minnesota Statutes Section 473.123. The Met Council's central office is located in the city of St. Paul, State of Minnesota, County of Ramsey. Defendant Met Council owns and operates Metro Transit that provide bus service throughout the Twin Cities metropolitan area. Metro Transit's central office is located in Minneapolis, Minnesota.

**JURISDICTION and ADMINISTRATIVE EXHAUSTION**

4. This Court has jurisdiction pursuant to 28 U.S.C. Section 1331, federal question jurisdiction. Webber has asserted claims for discrimination because of disability under the Americans with Disabilities Act of 1990, as amended ("ADA") 42 U.S.C. Section 12101, et seq. and the Rehabilitation Act of 1973, 29 U.S.C. Section 790, et. seq. ("RA"). Webber filed a charge of discrimination with the EEOC on or about January 2020 as a continuing action and has complied with all administrative requirements for his claims and received a notice of right to sue on May 5, 2022.

5. This Court also has jurisdiction pursuant to federal question jurisdiction because Webber has also asserted a claim for discrimination because of his disability status under the ADA.

6. This Court has jurisdiction pursuant to 28 U.S.C. Section 1367, supplemental jurisdiction. Webber has asserted a claim for discrimination because of disability under the Minnesota Human Rights Act (MHRA), Minn.Stat. Section 363A.01 et seq.

The facts for the state claim operate form the same case or controversy as the federal claims in this action.

## FACTS

### A. Timmy Webber

7. Webber is a very long-term and dedicated employee of Metro Transit, having worked as a full-time bus operator since 2001.

8. During his tenure, Webber has proven to be an exceptional driver.

9. Webber has an excellent driving record, and he has no history of performance or behavioral issues whatsoever.

10. Indeed, by any measure, Webber is a model bus operator, and no evidence exists to dispute that characterization.

11. Webber also happens to have been born with cerebral palsy, a relatively common motor disability, and as a result he wears a brace on his left leg for foot support and to assist with balance during walking.

12. As Metro Transit management well knows, these factors do not pose any substantial limitation on Webber's ability to operate a bus, and no DOT-certified medical examiner has ever deemed Webber unfit to operate a bus due to physical limitations caused by cerebral palsy (at least until this case arose).

13. It is also worth noting that the symptoms of cerebral palsy are well-understood to vary vastly from case to case, and it is impossible to make medical conclusions about an individual's physical limitations or abilities based solely on the fact that the person has cerebral palsy.

### B.     The December 2019 DOT Medical Examination with Dr. Michael Lockheart.

14. Metro Transit requires its bus operators to receive periodic physical examinations from a DOT-certified medical examiner in order to certify fitness for duty pursuant to medical standards developed by the Federal Motor Carrier Safety Administration ("FMCSA"). Over the course of his employment, Webber has submitted to numerous DOT medical examinations with doctors at Metro Transit's medical services provider, Minnesota Occupational Health ("MOH").

15. Typically, employees must submit to a medical examination every two years, and a routine DOT medical examination takes about 30 minutes.

16. In the event that the operator is deemed fit for duty pursuant to FMCSA regulations, the medical examiner provides the operator with a special "Metro Transit" DOT card.

17. Pursuant to its own internal policies, Metro Transit only accepts these special "Metro Transit" DOT cards from MOH doctors.

18. Although exceptions have been made in the past, Metro Transit generally will not accept DOT cards issued by DOT-certified medical examiners who are not employed by MOH.

19. The main facts of this case arose in December 2019 when Metro Transit required Webber to submit to a medical examination with Dr. Michael Lockheart, an occupational health specialist employed by MOH. Prior to December 2019, Webber had never received an evaluation by Dr. Lockheart.

20. Throughout the examination, Dr. Lockheart subjected Webber to demeaning comments about his disability, employed overly invasive and seemingly unnecessary procedures, and required him to engage in humiliating physical tasks that no doctor had ever requested before.

21. In fact, as soon as Dr. Lockheart noticed Webber's leg brace and learned that he has cerebral palsy, Dr. Lockheart commented that Webber was "playing Russian roulette with the lives of his passengers."

22. And when Webber responded that he has been a bus operator for almost two decades with no issues, Dr. Lockheart retorted that "someone must have dropped the ball" by allowing him to drive a bus, and that he was going to "make it right."

23. Dr. Lockheart then proceeded to aggressively pull-on Webber's arms, which no other MOH doctor had ever done before.

24. And when Webber asked Dr. Lockheart to explain the need to pull on his arms, Dr. Lockheart refused, stating only that he was "not an orthopedic specialist."

25. Webber then explained that he did not have any limitations with use of his arms, and that he has no trouble driving "stick shift" vehicles, to which Dr. Lockheart condescendingly responded, "just because you say you can drive a stick doesn't mean you really can."

26. Dr. Lockheart then forced Webber to "walk like a duck" across the examination room.

27. By the end of the examination—which Webber endured for almost two hours—he was so upset that he was shaking.

28. Never before had he been subjected to such demeaning and inappropriate treatment by a doctor.

29. And then to top it off, Dr. Lockheart informed Webber that he would not certify him to operate a Metro Transit bus unless and until he underwent a "skill performance assessment" ("SPE") which required Webber to submit to further invasive medical

examinations, complete an application for employment (for a job he had already held for 18 years), and submit to a driver's road test examination.

30. Needless to say, after working as bus operator for almost two decades and believing that he would retire as a Metro Transit bus operator, Webber was extremely distraught by Dr. Lockheart's comments, behaviors, and suggestion that he was not medically qualified to continue his chosen career simply because he had cerebral palsy.

31. Webber only became more dismayed to learn that Metro Transit had accepted Dr. Lockheart's recommendations to preclude him from bus operation work, notwithstanding that no other MOH doctor had ever concluded that Webber's cerebral palsy affected his ability to operate a bus.

32. Over the course of the next several weeks, Webber made an extensive effort to comply with the requirements of the SPE while he was prohibited from working as a bus operator, including attending additional medical examinations.

33. Meanwhile Webber, along with representatives of his union, Amalgamated Transit Union Local 1005, filed formal complaints with Metro Transit regarding his treatment by Dr. Lockheart and the decision to hold him out of bus operation work for highly questionable reasons.

34. Unfortunately, the disparaging treatment of Webber only continued.

35. At one meeting, one of Metro Transit's Occupational Health employees, Alexis Rogers, falsely referred to Webber as an "amputee."

36. Another Occupational Health department manager, Deborah Aebi, accused Webber of falsifying information to Dr. Lockheart.

37. Rather than assisting Webber with a prompt return to work, it appeared to Webber that Metro Transit management cared only about defending Dr. Lockheart and coming up with justifications to keep him out of bus operations.

38. Eventually, after approximately two months of completely unnecessary medical examinations, meetings, and uncertainty about the future of his career, on February 12, 2020, Webber received a DOT card from another MOH doctor, and Metro Transit allowed him to return to work as a bus operator.

39. By that time, however, the damage had been done. As a result of the actions of Metro Transit management and Dr. Lockheart, Webber suffered, and continues to suffer, significant anxiety about his future.

40. Webber has had many sleepless nights, and he has been robbed of the pride that he used to feel about being a Metro Transit bus operator.

41. In fact, this episode has dramatically impacted Webber's entire family (Webber has a wife and five children), as they now worry that their livelihood may be taken away based on the capricious whims of doctors that Webber must periodically revisit for the rest of his career. The following are the direct words of Webber's wife, Lisa Webber:

> *It has now been a few years since this first happened. We have had to live in fear of job security. We have had to change our lifestyle, focusing on mainly necessities, just in case. I have watched my husband change. He complains about going in everyday. He is now filled with dread. With all the time and all the years he has put in. He has earned his seniority. He used to be so proud about where he fell in the pick. Every year he would talk about moving closer to the beginning of the pick. He wore that as a badge of honor just like the numbers on his shoulder. He was proud when a "zip code" driver would ask him something or for advice. He used to proudly display all the pins he has earned. Now they are tucked away in the closet.*
>
> *This has hurt him he is not the same. It is horrible to live with doubt, and uncertainty, and fear. It effects us all Tim, our kids, and myself.*

> *It has been going on three years now and is still as fresh as the day Tim came home on that day of his DOT physical. I could never have imagined how much a regular part of his job; getting his DOT physical; would have changed our lives so much. We have both became more bitter, more cynical, and more distrusting because of this. It has effected our quality of life. How do you reassure and comfort your loved one. He doesn't want to lose his job although he still fears he may. He feels the need to bring a witness to all his DOT physicals now. I cant imagine feeling like I need protection and proof of fair treatment. That I'd have to question what are the motives for anything new that may happen. Especially at a place I had been working at for nearly 21 years.*
>
> *I don't have the education of a doctor. but I am doing my best to convey how this has affected us. It truly is difficult to describe to anyone that hasn't experienced anything like this. It is a shadow that stays with you. It hasn't gone away or even dulled.*

42. For his part, Webber will testify that this matter has had a lasting impact on his well-being, and he has suffered significant emotional distress, and he no longer believes that Metro Transit cares about him as an employee.

43. Prior to this ordeal, Webber regularly worked significant overtime and dedicated himself to furthering the interests of Metro Transit.

44. Now, Webber sees Metro Transit only as a job.

45. He reports to work, finishes his shift, and then he goes home.

46. He no longer works regular overtime assignments.

47. The medals that Webber used to wear proudly to work every day have been stowed away.

## JURY DEMAND

48. Plaintiff hereby demands a trial by jury on any issues triable as a matter of right.

## CAUSES OF ACTION

## COUNT I – VIOLATION OF AMERICAN WITH DISABILITIES ACT – 42.U.S.C. SEC. 12111 et seq.

49. Webber realleges paragraphs 1-45 and incorporates them herein. Defendant Metropolitan Council's conduct towards Webber described above violated the American With Disabilities Act of 1990 (ADA), 42 U.S.C. Section 12111 et. seq, by discriminating against him because of his disability, or perceived disability, in his employment and in the terms, conditions, and privileges of employment and failing to promote and hire Webber, provide advancement opportunities, and failure to reasonably accommodate his disability in violation of 42 U.S.C. Section 121112. As a result, Webber was injured and sustained damages in excess of $75,000.

## COUNT II – VIOLATION OF AMERICANS WITH DISABILITIES ACT – 42 U.S.C. SEC. 12131 et. seq.

50. Webber realleges paragraphs 1 through 46 and incorporates them herein. Defendant Met Council, as a public entity and on the basis of Webber's disability, violated the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. Section 12201 et. seq, by discriminating against Webber, and also violated the Act by excluding Webber from participation in and denied Webber the benefits of the services, programs, and activities of Defendant, a public entity, in violation of 42 U.S.C. Section 12132. As a result, Webber was injured and sustained damages in excess of $75,000.

## COUNT III – VIOLATION OF MINNESOT HUMAN RIGHTS ACT – MINN. STAT. 363A.01 et. seq.

51. Webber realleges paragraphs 1 through 47 and incorporates them herein. Defendant Met Council violated Minn.Stat. 363A.08 subd. 2 by, based on Webber's disability and qualification as a qualified individual with a disability, refusing to hire or maintain a system of employment which unreasonably excludes a person seeking

employment and discriminating against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

52. Defendant Met Council's conduct was done willfully, wantonly, maliciously, and with deliberate disregard for the rights of Webber entitling him to punitive damages in excess of $75,000.

## COUNT IV – VIOLATION OF REHABILITATION ACT OF 1973 – 29 U.S.C. SEC. 794 (a.k.a. Section 504)

53. Webber realleges paragraphs 1 though 52 and incorporates them herein. Defendant Met Council violated 29 U.S.C. Section 794 by, based on Webber's disability and qualification as a qualified individual with a disability, excluding him from participation in, denying him the benefits of, and subjecting him to discrimination under program receiving Federal financial assistance.

**WHEREFORE**, Webber prays for judgment against Defendant as follows:

1. Damages in excess of $75,000 under Count II through III.
2. Injunctive relief in the form of promotion and/or reinstatement into a higher grade level position.
3. Punitive damages in excess of $75,000 under Count III.
4. Damages in the form of lost wages, salary, employment benefits, or other compensation denied to Webber by reason of the violation under Counts II and III.
5. Any equitable relief the court deems appropriate, including front pay, under Count I through III.
6. Treble damages under the Claims.
7. Pre-judgment and judgment interest on all amounts awarded.
8. Attorney's fees and costs as allowable by law.

10

9. For such other and further relief as the court deems just and equitable.

**THE HUTTON FIRM, PLLC**

August 3, 2022

*/s/ Lee A. Hutton, III*
Lee A. Hutton, III (Atty No. 0327992)
SPS Tower
Suite 2150
333 South Seventh Street
Minneapolis, Minnesota 55402
E: lhutton@thehuttonfirm.com

**ATTORNEYS FOR PLAINTIFF**

**VERIFICATION STATEMENT**

I have read the foregoing VERIFIED COMPLAINT and know its contents. That I am informed and believe and, on that ground, allege that the matters stated in the foregoing document are true. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true. I declare under penalty of perjury under the laws of the State of Minnesota that the foregoing is true and correct.

*/s/ Timmy Webber*